## C. C. WILBOURN v. JANE BISHOP ET AL.

1. CONTRACT OF SALE OF LAND. *Certainty. Purchase-money. Contingency of sale.*
   An instrument of writing in which the subscriber thereof promises to convey to another a certain described tract of land, for an amount to be ascertained upon a basis therein prescribed, and which fixes the contingency upon which the sale will be consummated, is, in respect to such particulars, sufficiently definite and certain to entitle the promisee to have it enforced according to its terms.

2. SAME. *Consideration implied. Mutuality.*
   Although such instrument should contain no express obligation except on the part of him who executed it, yet if the circumstances connected with its execution imply a corresponding and correlative obligation on the part of the obligee, it cannot be treated as a *nudum pactum*, or as wanting in mutuality of obligation.

3. SAME. *Suit to enforce. Purchase-money—when to be tendered.*
   Where the obligor in a contract for the sale of land repudiates the contract and denies the right of the obligee under it, the latter is not required to tender the purchase-money before bringing his suit to enforce the contract, but it is sufficient if his bill contains an offer to pay the amount which may be found due the obligor, and especially so where such amount cannot be fully ascertained till certain facts only known to the defendant have been disclosed.

4. SAME. *Rights of contractee. Purchaser—whether bond fide.*
   A purchaser of land who has not paid the purchase-money thereof, nor received a conveyance of the legal title thereto, does not occupy the attitude of a *bond fide* purchaser toward one holding a prior contract of sale enforceable against the legal owner of the land.

APPEAL from the Chancery Court of Panola County.

EUGENE JOHNSON, ESQ., Special Chancellor, by agreement of the parties, Hon. J. G. Hall being of counsel in the case.

On the 18th of May, 1874, John Bishop bought at a tax-sale, for one hundred and forty-eight dollars and eighty-seven cents, a certain tract of land previously belonging to his sister-in-law, Chloe M. Wilbourn. Seven days thereafter, on the 25th of May, a deed of trust was executed by Chloe M. Wilbourn upon this land to secure a debt of two hundred dollars which she owed John Bishop. On the 26th of May, 1875, Bishop signed a paper purporting to be

an " obligation," which, after referring to his purchase of the land,
recited that " when the said Chloe M. Wilbourn shall pay the
purchase-money and taxes, and one two hundred dollar note that I
hold against her and twenty-five per cent. on the same, then the
said John Bishop will make the said Chloe M. Wilbourn a good
deed to said land and all that pertains to the same, or assign all the
right, title, and interest he has to said land."

Chloe M. Wilbourn died in September, 1875, leaving two sons,
C. C. Wilbourn and Miles W. Wilbourn.

Default having been made in the payment of the debt secured
by Chloe M. Wilbourn's deed of trust of the 25th of May, 1874,
the land was sold on the 16th of February, 1878, under a decree
foreclosing the deed of trust, and was bought by Bishop for the
amount of the debt due and the costs of the suit.

On the 7th of March, 1878, Miles W. and C. C. Wilbourn, who
had previously been in the possession of the land, leased the same
from Bishop and gave him their note for the amount of the rent,
and on the same day Bishop executed a written instrument in the
following language : " Whereas I have purchased at tax and com-
missioner's sales the following lands (describing them), and have
expended thereon, in the way of money advanced on trust-deed,
taxes, costs of suit, attorney's fees, and damages, an amount aggre-
gating about seven hundred dollars ; and whereas there is still
pending in the Chancery Court of Panola County a suit pertaining
to said land, and I shall have to expend some money thereabout,
the amount of which is uncertain, in order to perfect my title, if
possible ; and whereas I am willing, when all controversy about
said lands has been finally settled, if determined in my favor, to
sell the same to C. C. and Miles· W. Wilbourn for an amount which
will at the time of sale make me entirely whole and reimburse me
for any and all moneys expended as aforesaid, and for costs and
attorney's fees, etc., together with interest and damages which I
may have incurred in or about said lands or may hereafter incur:
Now I am willing and hereby agree to sell and convey said land to
said C. C. Wilbourn and Miles W. Wilbourn when the said title
shall have been sustained, and take in payment therefor such sum

as I may then by computation find will reimburse and make me whole in the entire transaction. This agreement is in no way to affect the contract for rent made by said C. C. and Miles W. Wilbourn for said land this day, the only object being to express in writing my willingness to convey this land to the said C. C. and Miles W. Wilbourn at the conclusion of all litigation thereabout, and at a price which will fully reimburse me in the premises." This instrument, which was signed by Bishop only, was deposited with R. H. Taylor, an attorney, for safe-keeping.

In the suit mentioned in the instrument above set out, a decree was rendered in May, 1878, fixing a charge upon the land referred to for one hundred and forty-three dollars and forty-five cents, and on the 7th of October, 1878, the land was sold under this decree and bought by Bishop for the amount due on the decree.

John Bishop died in the fall of 1880, at which time C. C. and Miles W. Wilbourn still occupied the land. They refused to surrender the possession thereof to Bishop's heirs, and on the 11th of January, 1881, the latter obtained possession by an action of unlawful detainer. Soon afterward Bishop's heirs sold the land—a part to Wyche Thomas and the remainder to R. S. Saunders.

Having previously bought Miles W. Wilbourn's interest in this land, C. C. Wilbourn, on the 18th of November, 1881, filed the bill in this cause, upon the facts above stated, against Bishop's heirs and Thomas and Saunders, claiming that the written instrument executed by John Bishop on the 7th of March, 1878, and above set forth, was a contract for the sale of the land therein described, and that Thomas and Saunders purchased with notice of the complainant's rights, asking that such contract be enforced, and offering to pay whatever amount may be found due Bishop's estate and chargeable upon the land. This writing of March 7, 1878, is *referred* to in the bill as exhibit "D." It was also stated in the bill that the land is worth about seven thousand five hundred dollars. Bishop's heirs answered, denying that the paper signed by John Bishop on the 7th of March, 1878, was an executory contract of sale, and opposing the relief prayed for by the complainant. They state in their answer that the land is not worth nearly so much

as the amount stated by the complainant as the value thereof. Thomas and Saunders also answered, admitting that they knew at the time of their purchases of the existence of the writing of March 7, 1878, but saying they were advised that it was *nudum pactum* and void.

Upon final hearing a decree was rendered dismissing the complainant's bill; from which he appealed to this court.

*Craft & Cooper* and *J. R. Chalmers*, for the appellant.

We insist that the paper executed by John Bishop, March 7, 1878, and marked exhibit D to complainant's bill, is an executory contract for the sale and purchase of land. It has all the elements of such a contract.

The land is accurately described, the consideration clearly expressed, the basis definitely fixed, upon which the amount to be paid is to be determined. The vendor is to determine by computation the amount to be paid upon the basis agreed upon, and the amount when ascertained is to be paid by C. C. and Miles W. Wilbourn at the end of all litigation when the title of the said John Bishop is sustained and perfected in him. While there is some uncertainty as to the amount to be paid and when it is to be paid, yet the basis is definitely fixed and has all the certainty which is required to make the contract binding.

Bishop clearly understood that he was making a contract. His contemporaneous and subsequent conduct can be explained on no other theory than that he was *at the time* obligating himself to make the conveyance to C. C. and Miles W. Wilbourn upon the terms and stipulations *then agreed* upon, and that said parties *then agreed* and promised to comply with the terms and stipulations contained in said paper.

Now we submit that this paper is clearly a contract, and that if it had been signed by C. C. and Miles W. Wilbourn it would have been binding upon them and could have been enforced against them by Bishop or those claiming under him. We further submit that, being signed by Bishop and delivered by him to the said C. C. and Miles W., it can be enforced by the complainant against the defendants. *Marques* v. *Caldwell*, 48 Miss. 23 ; *Lee* v.

*Newman,* 55 Miss. 365; *Holmes* v. *Evans,* 48 Miss. 247; *Houston* v. *Jordan,* 42 Miss. 380.

It was contended below, and no doubt will be here, that complainant was not entitled to specific performance because he had not tendered the purchase-money before filing his bill.

The rule as to tender in this class of cases is well stated in Pomeroy's Jurisprudence, thus:

"The doctrine is fundamental that either of the parties seeking a specific performance against the other must show as a condition precedent to obtaining his remedy that he has done or offered to do, *or is then ready and willing* to do, all the essential and material acts required of him by the *agreement* at the time of commencing the suit, and also to do such acts as shall be required of him in the specific execution of the contract according to its terms." Pomeroy's Equity Jurisprudence, vol. 3, § 1407. See also note 1 to said section.

We submit, then, that we have strictly complied with this rule in our bill. We further submit that by the very terms of the contract or agreement complainant was not required to make a tender before filing his bill, and, in fact, could not have done so, because from the nature of the basis upon which the amount to be paid was to be ascertained it was not possible for complainant to know or ascertain the amount except from Bishop, and hence the agreement was that Bishop was to ascertain the amount by computation at the end of the litigation when his title was sustained.

And furthermore, "An actual tender by the plaintiff is unnecessary when from the acts of the defendant or from the situation of the property it would be wholly nugatory. Thus, if the defendant has openly refused to perform, the plaintiff need not make a tender or demand. It is enough that he is ready and willing, and offers to perform in his pleading." Pomeroy's Eq. Jurisprudence, vol. 3, § 1407, note (1) under head, "Tender, when necessary;" *Hunter* v. *Daniel,* 4 Hare 420–433; *Matlock* v. *Young,* 66 Maine 459–467; *Crary* v. *Smith,* 2 N. Y. 60–65; *Kerr* v. *Purdy,* 50 Barb. 24; *Maxwell* v. *Pettenger,* 2 Green's Ch. 156; *White* v. *Dobson,* 17 Gratt. 262; *Brock* v. *Hidy,* 13 Ohio St. 306, 310;

*Brown* v. *Eaton*, 21 Minn. 400, 411 ; *Gill* v. *Newell*, 13 Minn. 462, 472 ; *Deichman* v. *Deichman*, 49 Mo. 107 ; *Gray* v. *Dougherty*, 25 Cal. 266, 280, 281.

*Hall & Boothe* and *W. D. Miller*, for the appellees.

It is insisted by counsel for appellant that the paper executed by John Bishop March 7, 1878, is an executory contract of sale. We insist for the appellees that the paper referred to is a mere voluntary expression of willingness to sell by Bishop, and that it is void for uncertainty, want of mutuality, and want of consideration.

No authorities are needed to show that a contract must be certain in its terms, or capable of being made certain, in order to make it valid. The principle is fundamental. And the means of making it certain must appear on its face. But in this case the paper relied upon by appellant was neither certain on its face nor is there any mode pointed out by which it can be made certain. Bishop expressed his willingness to sell the land to the Wilbourns under certain contingencies. At what price, Bishop himself did not know.

On its face the paper was uncertain as to the price for which he was to sell, nor is any mode fixed by which it could be made certain. Bishop realized that he alone could compute the amount. No court could ascertain with certainty "all moneys expended" by Bishop about the land, or undertake to fix a sum which would "make him whole in the entire transaction."

Moreover, the time within which Bishop was to fix a price was hopelessly uncertain. It was to be "at the conclusion of all litigation," which might never be. But to use the language of Sharkey, C. J., "Courts of equity will not enforce contracts unless they are certain in their terms, and this rule applies with additional force as between the representatives of the contracting parties." *Montgomery et al.* v. *Norris*, 1 How. 506.

The paper sued on in this case is void as a contract, for want of mutuality.

It has been held in many cases that to constitute a valid contract there must be MUTUAL PROMISES OR OBLIGATIONS CONCURRENTLY

ENTERED INTO. *Tucker* v. *Woods,* 12 Johns. 190 (7 Am. Dec. 305 and note); *Utica & Sch. R. R. Co.* v. *Brinkerhoff,* 21 Wend. 139 (34 Am. Dec. 221); *Ellsworth* v. *So. Minn. Rail. Ex. Co.,* 31 Minn. 543; *Busher* v. *Van Buskirk,* 2 A. K. Mar. 345; *Beau* v. *Burbank,* 16 Maine 459.

But in every case it must appear AS A FACT that there was the assent of BOTH minds to the contract, and that the promise or the agreement sought to be enforced is the expression of that which has been actually agreed upon by the parties, and not the mere proposition of one of the parties.

Tested by this rule, the paper signed by Bishop (Exhibit D) falls far short of an executory contract which can be specifically enforced. From the beginning to the end of it there is not a line or a word to show that the Wilbourns ever agreed to anything.

There was no consideration for the alleged contract of Bishop. It is not alleged in the bill that the Wilbourns either paid anything or promised to pay anything or did anything in consideration of Bishop's proposition. If there are allegations which could be construed to mean that there was any undertaking, act, or promise on their part, such statements are expressly negatived by the answer, and there is no proof to support the bill.

The rule in regard to the enforcement of executory agreements under such circumstances is well stated thus : " Equity will never enforce an executory agreement unless there was an *actual* consideration, and, unlike the common law, it does not permit a seal to supply the place of a real consideration. Disregarding mere forms and looking at the reality, it requires an *actual valuable consideration* in every such agreement." 3 Pom. Eq. Jur., § 1293 and authorities ; 1 Ib., §§ 370–372.

So it has been said by the Supreme Court of Illinois (5 Gilman R. 223) : " It is a stern rule of equity that it will not decree the specific execution of a contract unless it is based on some fair and valuable consideration." See also *Mercer, Administrator,* v. *Stark,* Walker's Miss. R. 451 ; *Vasser* v. *Vasser,* 23 Miss. 378.

Even if the paper signed by Bishop was sufficient as a contract, it would be inequitable and unjust to decree specific performance in

this case. The record shows that nearly four years elapsed after the paper was signed by Bishop before appellant filed his bill; that not a dollar of money was ever paid, nor an obligation executed, nor an act performed by him on account of his alleged purchase, and that he went into possession as Bishop's tenant and never disputed his title until after his death. It is further shown that he was dispossessed of the land by legal proceedings after the death of Bishop; that Thomas and Saunders bought the land *after* appellant was ousted and while the heirs of Bishop were in possession, and that though they were informed of the existence of the paper (Exhibit D) they were also informed that it was a voluntary agreement and not enforceable as a contract.

CAMPBELL, C. J., delivered the opinion of the court.

The paper of the 7th of March, 1878, executed by John Bishop, evidences a contract of sale capable of enforcement. It is sufficiently certain in its terms, and is supported by a sufficient consideration, and its specific performance will not be inequitable, but highly equitable, and will be the accomplishment of what John Bishop manifestly contemplated and stipulated for. The instrument furnishes the basis for computation of the amount Bishop was to receive for the purchase-money and fixes the contingency on which the sale was to be finally consummated. It was, therefore, definite and certain enough. Although the paper contains no provisions except in favor of Bishop, who executed it, the circumstances connected with the transaction are enough to raise an implication of corresponding and correlative obligation on the part of the Wilbourns. The paper executed by Bishop on the 26th of May, 1875; the fact that on the day on which the instrument of 7th of March, 1878, was made the Wilbourns became the tenants of Bishop, obligating themselves to pay him rent for the land, thereby acknowledging his title and relinquishing their rights as heirs of Chloe M. Wilbourn by virtue of the paper of 26th of May, 1875, or otherwise; the great excess of the value of the land beyond the charge on it in favor of Bishop; the relationship between the parties, and the attitude of Bishop toward the land

from his first connection with it to his death, as ascertained from the several papers relating to it, give abundant evidence of a sufficient consideration to uphold an agreement by Bishop to sell the land on the terms named in the contract of 7th of March, 1878. The circumstances fairly raise an implication of reciprocity of obligation between the parties. If it appeared that the paper of 7th of March, 1878, was purely voluntary or a mere proposal it should not be enforced, but the contrary is plainly to be inferred.

The instrument itself, its delivery for safe-keeping, its reasonableness, its harmony with the attitude ever maintained by Bishop toward the land and its owners, satisfy us that the paper of March 7, 1878, was intended to furnish the measure of the rights of Bishop and the Wilbourns, and was so understood by all concerned.

During Bishop's life matters remained as fixed by the contract of 7th of March, 1878, by which Bishop was to be paid rent, and at the time prescribed by his agreement was to sell the land for the stipulated price.

A sufficient explanation of this continuance is found in the fact that another suit seeking to fix a charge on the land was brought against Bishop after the 7th of March, 1878, and it was pending at his death. This also furnishes a sufficient explanation of the absence of any effort by the Wilbourns to effect a consummation of the sale stipulated for.

After the death of Bishop his heirs dispossessed the Wilbourns of the land by unlawful detainer, denied their claim as purchasers, and repudiated all obligation on the part of Bishop or his heirs to convey the land. Under these circumstances it was sufficient for the complainants to make an offer in their bill to pay what is due the heirs of Bishop when ascertained, without having made a precedent tender, which would have been refused. Besides this, it was not known how much to tender. The amount beyond seven hundred dollars consisted of expenditures by Bishop, information of which should come from the defendants, who are his heirs.

The parties to whom the heirs of Bishop sold the land are not shown by the answer to occupy the attitude of *bonâ fide* purchasers

entitled to protection. They do not claim to have paid the purchase-money and received conveyance of the legal title.

*Decree reversed and cause remanded for further proceedings in accordance with this opinion.*